# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 16-1400V
(Not to be Published)

* * * * * * * * * * * * * * * * * * * * * * * *
| | |
|---|---|
| KATHARINE GMUER, *as parent and natural guardian of*, T.G., *a minor*, | Special Master Corcoran |
| | |
| | Filed: July 26, 2018 |
| Petitioner, | |
| v. | Attorney's Fees and Costs; |
| | Reasonable Basis. |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| | |
| Respondent. | |

* * * * * * * * * * * * * * * * * * * * * * * *

*Renee J. Gentry*, Vaccine Injury Clinic, George Washington Univ. Law School, Washington, DC, for Petitioner.

*Ann D. Martin*, U.S. Dep't of Justice, Washington, DC, for Respondent.

### DECISION DENYING AWARD OF ATTORNEY'S FEES[1]

On October 26, 2016, Katharine Gmuer filed a petition on behalf of her minor child, T.G., seeking compensation under the National Vaccine Injury Compensation Program.[2] The Petition alleged that the Influenza, Hepatitis A, DTaP, and Varicella vaccinations received in November 2013, December 2013, and April 2015 caused T.G. to develop various behavioral problems and other injuries. *See* Petition ("Pet.") (ECF No. 1) at 1-2.

---

[1] Although this Decision has been formally designated "not to be published," it will nevertheless be posted on the Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the ruling will be available to anyone with access to the internet**. As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

Following the filing of medical records and the Rule 4(c) Report in the case, and an unsuccessful attempt by Petitioner to retain an expert, Petitioner filed a motion to dismiss less than one year later, on September 25, 2017, in which she indicated that "an investigation of the facts and science supporting has demonstrated to the Petitioner that he will be unable to prove that he is entitled to compensation" and that "to proceed any further would be unreasonable and waste the resources of the Court, the respondent, and the Vaccine Program." Mot. to Dismiss at 1 (ECF No. 16). Thereafter, I granted the motion and dismissed the Petition on September 26, 2017. ECF No. 17.

Petitioner has now filed a motion requesting final attorney's fees and costs, dated March 30, 2018. *See generally* Application for Fees and Costs, ECF No. 22 ("Fees App."). Petitioner requests reimbursement of attorney's fees and costs in the total amount of $47,149.75 (representing $46,615.80 in attorney fees and $533.95 in costs). *Id.* Petitioner also requests $239.62 in costs personally paid by Petitioner. *Id.* Respondent reacted to this motion on April 12, 2018, contesting any award of fees and costs because "Petitioner's claim lacked a reasonable basis when filed, and one was never established." Response, dated April 12, 2018 (ECF No. 23) at 6.

The matter is now ripe for disposition. For the reasons stated below, I find that Petitioner has not established that there was a reasonable basis for her claim. Therefore, I hereby **DENY** Petitioner's motion for attorney's fees and costs.

**BACKGROUND**

I.      **Summary of Relevant Medical Facts**

T.G. was born on April 16, 2011, and there were no complications during pregnancy, labor, and delivery. Petitioner's Exhibit ("PX") 16 at 25-34. He received a Hepatitis B vaccine on April 17, 2011 and was discharged home the following day in good condition. *Id.* at 111. On May 13, 2013, T.G. was seen for a physical examination to establish pediatric care, and was given the DTaP, varicella, Hep A, and pneumococcal conjugate ("PCV") vaccines. PX 1 and 1-4. Approximately one month later, on June 18, 2013, he was brought to the hospital due to a rash on his right thigh and hip, along with fever and irritability. PX 2 at 10. His parents noted that three weeks ago, they had removed a tick from the affected area, and doctors treated him suspecting Lyme disease, prescribing him amoxicillin. *Id.* On June 20, 2013, T.G. returned to the hospital because of an urticarial rash "most likely related to [an] allergic reaction to amoxicillin" and was prescribed Ceftin and Benadryl. *Id.* at 8.

On November 11, 2013, T.G. was brought in for a well-child appointment. PX 1 at 6. He was noted as having been doing well since his last appointment, and was given Hep A and flu (first

split-dose) vaccines at this time. *Id.* at 6, 7, 13. The records show that T.G. received his second dose of flu vaccine on December 10, 2013. *Id.* at 10, 16. On December 26, 2103, T.G. presented with complaints of a stomach virus, vomiting and diarrhea that had since resolved, nasal congestion, and bilateral eye redness with discharge. *Id.* The doctor's impression was pink eye, and T.G. was prescribed polytrim ophthalmic drops, and recommended warm compresses. *Id.* at 9. There are no contemporaneous records from this time period in which a reaction to these vaccinations was reported, and no evidence that any treaters from this period associated any of T.G.'s illnesses with the November 2013 vaccines.

Based upon the records filed, it appears that T.G. was next seen on June 7, 2014 (approximately seven months after the fall 2013 vaccinations), when his mother brought him to Fast Track Urgent Care, complaining of fevers over the past month along with a decrease in appetite, increasing lethargy, and joint aches and pains, particularly in the knees. PX 6 at 3. He was diagnosed with an upper respiratory infection and sent home to follow-up with his pediatrician for possibly infectious disease, although at that time he tested negative for streptococcal virus. PX 7 at 85. He was again evaluated for persistent fevers on June 12 and 19, 2014. PX 7 at 52-67. The notes from T.G.'s June 19, 2014 visit state that he "has now been having 6 weeks of persistent recurring fevers . . . lasting up to 48 hours that occurs every 5 to 7 days and intercurrent periods of wellness." *Id.* at 55. After an extensive evaluation for a cause of the fevers, including serologies and cultures for multiple infections etiologies and rheumatologic screens, an assessment of unknown cause was made with consideration given to "noninfectious etiologies" and "periodic fever syndrome of some type." *Id.* at 55-56.

On July 18, 2014, T.G. presented for a well-child exam. The doctor's notes stated that "overall he is healthy, mom's main concerns for today are behavior issues, especially now that he will be starting a new preschool." PX 3 at 1. Specifically, it was noted that "parents both have a history of ADHD and they have started seeing signs and symptoms in him. He was hyperactive, easily distracted, and when he is hyperfocused on something, it is impossible to get his attention." *Id.* Other behavioral concerns, such as trouble with toilet training, and issues with certain textures, were noted. *Id.* The doctor's impressions included "ADD of Childhood with Hyperactivity" and "Unspecific Delay in Development (related to oral and texture issues)" and T.G. received a psychiatric referral due to the hyperactivity behaviors and an occupational therapy ("OT") referral for his other issues. *Id.* at 4-5.

There is no contemporaneous recording of any further problems with T.G.'s health from the summer of 2014 until the spring of 2015. Specifically, on April 15, 2015, T.G. again saw his pediatrician and he was reported to be doing well, although the well-child exam notes that he "still has some sensory integration issues and is working with an occupational therapist." PX 3 at 7-10. The following day, on April 16, 2015, T.G. received DTaP, IPV, MMR, and varicella vaccinations. *Id.* at 13.

There is yet another records gap, and then two months later, on June 13, 2015, T.G. was taken to Fast Track Urgent Care due to a fever that started the previous night. PX 6 at 6-7. His physical exam was normal and the psychiatric exam showed a "[n]ormal male child with age appropriate behavior." *Id.* He was diagnosed with "benign febrile illness" and "pediatric viral syndrome" and discharged home. *Id.* at 8.

*2016 and Behavioral Diagnoses*

The records for 2016 and beyond (now well after the administration of the allegedly causal vaccines in question) reveal that T.G. has been diagnosed with a number of potential behavioral problems. On April 19 and 20, 2016, T.G. was seen by Dr. Alison Bomba for psychological counseling services. PX 12. The presenting problem was described as "anxiety and behavioral difficulties," along with problems of excessive crying, excessively anger at time, rigid thinking, attention-seeking behaviors, risky behaviors, etc. *Id.* at 3, 5. Dr. Bomba's impression was adjustment disorder with mixed disturbance of emotions and conduct, and recommended individual therapy sessions. *Id.* at 33. On June 20 20, 2016, T.G. was again taken to urgent care with complaints of fever, where he was diagnosed with pneumonia and strep throat and was discharged. PX 20 at 4. These records do not reveal an instance in which a treater associated T.G.'s 2013 or 2015 vaccinations with his conditions, however.

The following night, T.G. was brought to the emergency room at Children's National Medical Center ("CNMC") with a chief complaint of increased agitation throughout the night, with T.G. become more combative, biting, and hitting. PX 7 at 14. Previously, T.G. had been brought to another hospital, where he was given two doses of Haldol to control his outbursts before he was transferred to CNMC for further management. *Id.* T.G. was held at CNMC until his discharge home on April 29, 2016. During his time there, a brain MRI and an EEG were normal. *Id.* at 4-5, 43. Results of a lumbar puncture also showed that CSF cell count, protein, and myelin basic protein were within normal limits. *Id.* at 41. Serological tests for group A streptococcal titers were negative while two inflammatory markers (C-reactive protein and sedimentation rate) were mildly elevated. *Id.* at 45. T.G. was treated with one course of "IVIG in the setting of possible NMDA encephalopathy." *Id.* at 41.

During T.G.'s stay at CNMC he also underwent a psychiatric evaluation. The assessment noted that T.G. presented as "a 6 year old boy with hx of Lyme dz (2013), cyclic fevers with rash and subsequent dx of Strep infection (6/2014) admitted from outside hospital for workup of possible autoimmune encephalitis following 2 week hx of behavioral decline." *Id.* at 33. It further noted that "he has no previous psychiatric history although has a family hx significant for ADHD, anxiety disorders. Psychologically he has had several stressors which include a recent move and change in schools, the death of his dog in the past month and a recent diagnosis of cancer in a

grandparent. What is concerning in [T.G.]'s presentation is the fact that these symptoms of irritability, outbursts have occurred abruptly in the past 2 weeks." *Id.* at 33. The differential diagnosis was "delirium/behavioral change related to a general medical condition (e.g. autoimmune encephalitis, viral process, medical workup thus far has been unrevealing) which could be compounded by pre-existing psychiatric/developmental vulnerabilities." *Id.* at 34. Upon discharge, T.G. was prescribed risperidone with clonazepam as needed. *Id.* at 44.

On May 3, 2016, T.G. was brought to Dr. Beth Latimer, a neurologist, who diagnosed T.G. with Pediatric Autoimmune Neuropsychiatric Disorders Associated with Streptococcal Infections ("PANDAS").[3] PX 10 at 8. She also opined that he was likely to have an element of sleep apnea, and was recommended to continue treatment with risperidone. *Id.* After continuing worsening behavioral episodes, T.G. was again seen by Dr. Latimer on May 13, 2016, were he was prescribed a course of IV steroids and IV antibiotics and was admitted for this treatment. *Id.* at 8-9. It was also determined at this time that T.G. met the criteria for obsessive compulsive disorder and was prescribed Zoloft. *Id.*

On May 25, 2016, T.G. was brought to the pediatric department of Medstar Georgetown University Hospital for "hospital follow-up for PANDAS admission," where he was seen by Dr. Eunee Park. PX 3 at 10. Dr. Park's assessment was "(1) Obsessive Compulsive Disorder; (2) ? of ADD of Childhood with Hyperactivity; (3) Other Specified Mental Disorders Due to Known Physiological Condition (PANS)[4]." *Id.* at 12. Thereafter, on May 27, 2016, T.G. underwent an adenotonsillectomy and nasal endoscopy. PX 9 at 7-8. The operative report from this procedure notes that "he has had several episodes of strep tonsillitis in the past, all of which have required treatment with antibiotics" and that "his neurologist feels that his chronic tonsillitis may be related to his new-onset psychiatric illness," concluding that due to his "chronic tonsillitis and possible PANDAS, we elected to proceed with tonsillectomy." *Id.* at 22.

On September 16, 2016, T.G. was seen at the Pediatric Center of Frederick for recommendations as to what could be done about T.G.'s condition. The history notes that T.G.'s mother "feels the diagnosis of PANDAS was strongly influence (sic) by the connections that her mother had in DC (she is a psychologist) and wonders if there is another component to what is

---

[3] PANDAS "is a term used to describe certain children whose symptoms of neuropsychiatric conditions, such as obsessive-compulsive disorder or tic disorders, are worsened by strep infection. MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/strep-throat/symptoms-causes/syc-20350338 (last visited July 23, 2018).

[4] PANS refers to Pediatric Acute-onset Neuropsychiatric Syndrome. As it relates to PANDAS, PANS is a newer term used to describe the larger class of acute-onset OCD cases, whereas PANDAS refers only to those cases of acute onset OCD associated with streptococcal infections. *See Information About PANS/PANDAS*, NATIONAL INSTITUTE OF MENTAL HEALTH, https://www.nimh.nih.gov/labs-at-nimh/research-areas/clinics-and-labs/sbp/information-about-pans-pandas.shtml (last visited July 23, 2018). In short, PANDAS can be viewed as a subset of PANS.

going on. She was in touch with an ID specialist that studies vaccines at Georgetown . . . ." PX 21 at 4. Notably, this is the first medical record which indicates any concern that vaccines could be at the heart of T.G.'s issues.

Subsequently, on October 11, 2016, T.G. was brought to the neuropsychology department of the Kennedy-Krieger Institute to assess his neurocognitive and neurobehavioral functioning as well as to assist with treatment and educational planning. PX 17 at 22. The psychology report lists T.G.'s diagnosis as "Encephalitis and encephalomyelitis, Date Onset: April 10, 2016." *Id.* at 27. The report stated that "Mrs. Gmuer indicated being concerned [T.G.]'s health conditions may not be related to PANDAS and may reflect an autoimmune disorder. She noted [T.G.]'s high fevers and increased behavioral outbursts have always occurred within two weeks of receiving a new vaccination." *Id.* at 18. At this time, a diagnosis of "Attention Deficit Hyperactivity Disorder (ADHD) – Combined Type" and "Mild Neurocognitive Disorder due to Autoimmune Encephalitis" was made. *Id.* at 22. It further noted that "It is believed that [T.G.]'s clinical presentation of weaknesses in behavioral regulation, attention/concentration, preacedemic skills, and executive functioning are related to his diagnosis of autoimmune encephalitis in April 2016. Specifically, his ADHD symptoms appear to have been significantly exacerbated by his illness." *Id.*

On March 22, 2017 (several months after this case was initiated), T.G. was brought to a rheumatologist who allegedly made a preliminary diagnosis of periodic fever syndrome.[5] On July 12, 2017, T.G. also purportedly saw an immunologist who confirmed the diagnosis of periodic fever syndrome. *See* Status Report and Motion for Extension of Time (ECF No. 14), at 1. Petitioner has not provided medical records for either of these visits. On June 21, 2017, T.G. had a well child appointment at the Pediatric Center of Frederick, and the report from this visit indicated that T.G. was currently being treated for ADHD and OCD. Although the record mentioned that T.G. had visited a rheumatologist in March 2017, it did not indicate a diagnosis of periodic fever syndrome nor did it indicate any current treatment T.G. was receiving for this diagnosis. PX 21 at 1.

## II.   Procedural History

As previously noted, Petitioner filed the Petition on October 26, 2016. The Petition alleges that T.G. received the influenza and hepatitis A vaccinations on November 11, 2013, a follow-up influenza vaccination on December 10, 2013, and DTaP, IPV, MMR, and varicella vaccinations

---

[5] Periodic Fever Syndrome is the name of a group of characterized by recurrent episodes of inflammation. The most common type is Periodic Fever, Aphthous Stomatitis, Pharyngitis and Adenitis ("PFAPA"). MAYO CLINIC, https://newsnetwork.mayoclinic.org/discussion/mayo-clinic-q-and-a-child-with-recurrent-fever-may-have-periodic-fever-syndrome/ (last visited July 23, 2018). Because no medical records diagnosing T.G. with periodic fever syndrome have been provided, it is unclear as to whether he suffers from PFAPA or another less common periodic fever syndrome.

on April 16, 2015, and that these vaccines caused T.G. to develop various behavioral problems, caused diarrhea, vomiting, fevers, and other physical symptoms which continue to this day, or that the these vaccinations aggravated an unnamed preexisting condition. Pet. at 2. Petitioner then filed the majority of the medical records on December 2, 2016, followed by one additional medical record and a statement of completion on January 11, 2017.

Respondent filed his Rule 4(c) Report on March 21, 2017. ECF No. 11 ("Report"). Respondent noted that the case was not appropriate for compensation because "petitioner lacked a reasonable basis for filing the claim and does not have a reasonable basis to move forward with the petition." *Id.* at 2, 13. Specifically, Respondent noted that "T.G.'s medical records do not support petitioner's contentions, as set forth in the petition, that onset of T.G.'s condition occurred in December 2013, or that he suffered the significant aggravation of his condition following vaccines administered on April 16, 2015." *Id.* at 13.

Thereafter, I held a status conference on March 31, 2017. During the conference, I noted to Petitioner that after a review of the submitted medical records, I too had concerns about the viability of Petitioner's claim. Chief among these was the fact that there were very long gaps in the medical record between the vaccinations at issue, during which T.G. exhibited no problems at all, and the fact that although the Petition alleged that T.G. started to experience behavioral changes in December of 2013, the contemporaneous medical records from that time period did not reflect any mention of behavioral problems made to the treating physicians. Order, dated March 31, 2017 (ECF No. 12) at 1.

I therefore recommended that Petitioner take one or both of two courses of action. First, I informed Petitioner that she needed to carefully review the medical records and explain how her theory fit the facts of the case, specifically addressing whether she was alleging that both sets of vaccinations either caused or exacerbated T.G.'s injuries, and why there were long periods of time with no reported medical issues, physical and behavioral, following the vaccinations. Second, I informed Petitioner that she needed to obtain an expert report to explain how the gaps in the medical records were still appropriate to suggest a causal link between T.G.'s injuries and his vaccinations. If she were unable to address these concerns, I would likely conclude that the claim lacked reasonable basis. Order at 2.

On July 31, 2017, Petitioner filed a motion for an extension of time to file an expert report. ECF No. 14. In it, Petitioner indicated that since the status conference, T.G. had seen an immunologist and a rheumatologist, both of whom diagnosed T.G. with periodic fever syndrome. Petitioner maintained that this new diagnosis demonstrated the reasonable basis of the claim "due to the timing of preliminary symptoms as demonstrated in her affidavit, as well as the connection

between vaccines and periodic fever syndrome."[6] *Id.* at 2. Petitioner's request for additional time was based on the premise that this new diagnosis would open the door for an expert opinion demonstrating the relationship between the diagnosis of period fever syndrome and T.G.'s injuries. *Id*.

Petitioner also simultaneously filed additional medical records and an affidavit from T.G.'s mother in an attempt to provide greater context to the gaps in the timeline between T.G.'s vaccinations and his injuries and behavioral problems. Specifically, Petitioner noted that "[t]he 'long gaps in the medical record' that the Special Master noted are because several of T.G.'s symptoms during that time were behavioral or included coughing and fevers, for which parents typically do not bring children to doctors unless they are incredibly severe," and also noted that Petitioner faced periods of time without insurance and needed to treat T.G.'s fevers at home. *Id.* I granted Petitioner's motion, but noted that no further extensions of time would be given due to the amount of time Petitioner had been given to obtain an expert report or otherwise further substantiate her claims.

On August 31, 2017, Petitioner filed a status report indicating that she had been unable to find an expert to support causation and thus had given counsel authorization to dismiss the claim, requesting thirty days to conclude this matter. ECF No. 15. Thereafter, on September 25, 2017, Petitioner filed a motion to dismiss the Petition (ECF No. 16), which I granted the following day.

### III. History of Counsel's Work on this Matter

The billing records submitted in this matter reveals that counsel began working on Petitioner's case on June 16, 2016 – about four months before the matter was initiated.[7] Between that date and October 26, 2016 (the day the Petition was filed), primary counsel, Mr. Clifford Shoemaker, billed almost 40 hours on this matter, spread among communication with Petitioner, various doctors, Vaccine Injury Clinic law students, and reviewing medical records. Fees App. at 10-17. Additionally, beginning on September 10, 2016, three students from the George Washington Law School Vaccine Injury Clinic began working on this matter. From that date until the date the petition was filed, these students combined to bill an additional 45.4 hours. This time appears to have been spent reviewing the case file and records, researching T.G.'s diagnosed

---

[6] Petitioner has cited to one journal article suggesting a relation between fever attacks and immunization but has not provided medical records from the visits to the rheumatologist and immunologist when T.G. was allegedly diagnosed with periodic fever syndrome, nor has she provided any records which indicate that these doctors (or any others) considered a causal relationship between T.G.'s vaccinations and his periodic fever syndrome or an expert report concerning such a relationship.

[7] In actuality, work on this case likely began even earlier. Included among some of the medical records is the letter sent by Ms. Gentry, dated May 31, 2016, to various hospitals requesting T.G.'s medical records. *See,* e.g., PX 9 at 1. It does not appear this time was billed for by counsel, however.

conditions online, e-mailing Petitioner, participating in meetings with Mr. Shoemaker, and drafting the Petition. *Id.* at 23-26. In sum, over 80 hours of attorney time was spent on this matter before the Petition was filed – an ample amount of work to sufficiently evaluate the claim's merits before filing.

Work on the case proceeded thereafter, albeit at a slower pace. Mr. Shoemaker's time was spent largely corresponding with doctors and managing the law students, and outside of entries regarding "team meetings," no single entry billed was longer than 0.2 hours until Respondent filed his Rule 4(c) report on March 21, 2017. Fees App. at 8-10. Following the status conference on March 31, 2017, when I first informed Petitioner of my concerns about the reasonable basis for this case, barely any work was performed on the case. From that date on, Mr. Shoemaker only spent an additional 6.2 hours on the case, while the law students did not do any work on it until August 31, 2017, the day Petitioner filed the status report indicating she could not find an expert and would therefore be dismissing the case. *Id.* at 30-31. Thereafter, all billed law student time was spent either meeting with Mr. Shoemaker and co-counsel Ms. Renee Gentry or communicating with petitioner about the dismissal process. *Id.* at 31.[8]

## ANALYSIS

### I. Reasonable Basis Standard

I have in prior decisions set forth at length the criteria to be applied when determining if a claim possessed "reasonable basis"[9] sufficient for a fees award. *See, e.g.*, *Allicock v. Sec'y of Health & Human Servs.*, No. 15-485V, 2016 WL 3571906, at *4-5 (Fed. Cl. Spec. Mstr. May 26, 2016), *aff'd on other grounds*, 128 Fed. Cl. 724 (2016); *Gonzalez v. Sec'y of Health & Human Servs.*, No. 14-1072V, 2015 WL 10435023, at *5-6 (Fed. Cl. Spec. Mstr. Nov. 10, 2015). In short, a petitioner can receive a fees award even if his claim fails, but to do so he must demonstrate the claim's reasonable basis through some objective evidentiary showing and in light of the "totality of the circumstances," including all facts relevant to the to the case, as well as the evidence actually supporting the claim itself. *See Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 303, 303 (2011)). The nature and extent of an attorney's investigation into the claim's underpinnings, both before

---

[8] Although Ms. Gentry is listed as counsel of record, the billing record indicates that she played a much smaller role in the progress of this case – she only had one billing entry before the filing of the petition, and the description of her work indicates her role as more supervisory of the law students. Fees App. at 12. In total, Ms. Gentry only billed 4.15 hours on this matter. *Id.*

[9] Although good faith is one of the two criteria that an unsuccessful petitioner requesting a fees award must satisfy, it is an easily-met one – and Respondent does not question it in this case. *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996) (in the absence of evidence of bad faith, special master was justified in presuming the existence of good faith); Response at 4 n.3 ("Respondent does not challenge petitioner's good faith in bringing this petition.").

and after filing, is a relevant consideration. *See Cortez v. Sec'y of Health & Human Servs.*, No. 09-176V, 2014 WL 1604002, at *6 (Fed. Cl. Spec. Mstr. Mar. 26, 2014); *Di Roma v. Sec'y of Health & Human Servs.*, No. 90–3277V, 1993 WL 496981, at *2 (Fed. Cl. Spec. Mstr. Nov. 18, 1993) (citing *Lamb v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 255, 258–59 (1991)). Program attorneys are expected to conduct a reasonable pre-filing investigation—including an evaluation of the factual basis for the claim at minimum. *See Allicock*, 2016 WL 3571906, at *4; *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *7 (Fed. Cl. Spec. Mstr. Nov. 30, 2007) ("[a] reasonable pre-filing inquiry involves an investigation of the factual basis for a Program claim *or* the medical support for a vaccine petition") (emphasis added)).

The Court of Federal Claims recently provided further illumination as to the standards that should be used to evaluate whether the totality of the circumstances warrant a finding that reasonable basis existed. *Cottingham v. Sec'y of Health & Human Servs.,* No. 15-1291V, 2017 WL 4546579, at *10 (Fed. Cl. Oct. 12, 2017). As Judge Williams therein stated, a special master should consider "the novelty of the vaccine, scientific understanding of the vaccine and its potential consequences, the availability of experts and medical literature, and the time frame counsel has to investigate and prepare the claim." *Cottingham,* 2017 WL 4546579, at *5; *see also Amankwaa v. Sec'y of Health & Human Servs.*, No. 17-036V, slip. op., at 9-10 (Fed Cl. June 4, 2018) ("special masters must not consider subjective factors in determining whether a claim has reasonable basis[,]" and should "limit [their] review to the claim alleged in the petition . . . based on the materials submitted.") (quoting *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Spec. Mstr. Jan. 5, 2018)).

## II.   Petitioner's Claim Lacks Reasonable Basis for a Fees Award

Petitioner maintains that "Counsel filed T.G.'s case before they were able to fully complete the investigative review to preserve the statute of limitations," but this argument has no moment. Reply at 4. Program claimants can no longer invoke the fact that an attorney was compelled to file the case at the limitations cut-off to excuse an incomplete review of the case's objective basis at that time. *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017) ("Whether there is a looming statute of limitations deadline, however, has no bearing on whether there is a reasonable factual basis 'for the claim' raised in the petition."). Moreover, the billing record plainly establishes that counsel <u>did</u> have adequate time to investigate the claim – nearly four months. Indeed, Mr. Shoemaker began review of the records as early as June 29, 2016, while the law students devoted substantial time starting in September of 2016 to records review. Thus, the submitted documentation cuts against the assertion that counsel lacked adequate time to review the records.

Evidence that a claimant's counsel has had adequate pre-filing time to investigate a claim's basis has been noted in other cases in which reasonable basis was determined to be absent, and thus grounds for denying fees. *See, e.g., Carter v. Sec'y of Health & Human Servs.* 132 Fed. Cl.

372 (Fed. Cl. 2017) (special master did not abuse his discretion in denying an award of attorney's fees and costs when he determined that reasonable basis did not exist because the medical records did not support the petitioner's claim and counsel had adequate time to review those records); *Mounts v. Sec'y of Health & Human Servs.*, 129 Fed. Cl. 570 (Fed. Cl. 2016) (upholding special master's decision finding that reasonable basis did not exist when counsel had five months to obtain and review medical records before filing the petition and those records did not support the petitioner's theory). Vaccine Act attorneys are often paid for pre-filing work in meritorious cases – they should not receive compensation if that pre-filing period was not properly utilized.

Despite the above, counsel claims that there was sufficient objective evidence to support Petitioner's claim. Specifically, counsel states that "based on the medical records, the Mother's narrative, preliminary consultations with experts, and . . . most significantly, based on the extraordinarily complex nature of T.G.'s injuries which took four years to diagnose," they did have a reasonable basis to file the claim. Reply at 5. However, a careful canvassing of the medical records and other submitted information reveals that none of these cited reasons provide reasonable basis for the petition.

First, it is well established in the Program that a Petitioner's own statements are not "objective" in nature for reasonable basis evaluation purposes. *See, e.g.*, *Chuisano*, 116 Fed. Cl. at 291 (petitioner's affidavit detailing "subjective belief" of vaccine injury did not constitute objective evidence); *Foster v. Sec'y of Health & Human Servs.*, No. 16-1714V, 2018 WL 774090, at *3 (Fed. Cl. Spec. Mstr. Jan. 2, 2018) (reasonable basis existed where counsel relied *not* on statements made by the petitioner, but on "actual objective record proof") (emphasis added). Accordingly, Ms. Gmuer's narrative upon consultation with counsel (and her later submitted affidavit) cannot establish reasonable basis (at least alone).

Second, Petitioner maintains that the medical records establish objective evidence supportive of her claim that the vaccinations T.G. received on November 11, 2013, and/or April 16, 2015, either caused his behavioral changes and physical injuries or exacerbated an underlying preexisting condition. Reply at 5. But this argument flies in the face of the actual record. I noted during the preliminary status conference on March 31, 2017, that there were many obvious gaps in the medical records during which physical problems were presented but not behavioral problems, or vice versa – and in no case were these problems associated with vaccination.

In particular, none of the contemporaneous medical records from that time reference any of T.G.'s vaccinations as a suspected cause of either his physical or behavioral symptoms. None of T.G.'s treating physicians ever appeared to have attributed the vaccinations he received as playing a part in his health issues. Even the most cursory review of the records would inform counsel of this.

Further cutting against a finding of reasonable basis are the long gaps in the factual history and the unconnected course of T.G.'s injuries. T.G. received a split-dose influenza and hepatitis A vaccination on November 11, 2013. The next time he was seen by a doctor was December 26, 2013, with a complaint of "a stomach virus with vomiting and diarrhea that has since resolved" along with "bilateral eyes red with discharge." PX 1 at 9. Significantly, there were "no complaints of fever or difficulty breathing." *Id.* T.G. was diagnosed with pink eye and prescribed eye drops. *Id.* He was not seen again by a doctor until June 7, 2014, almost six months later. Such facts do not allow me to ascertain a temporal connection between T.G.'s November 11, 2013 vaccinations and any injury, whether physical or psychological.

Similarly, there does not appear to be any temporal connection between T.G.'s April 16, 2015 vaccinations and any alleged injury. Although T.G. had manifested behavioral issues by that time, the record reflects that treating physicians (as well as Petitioner herself) believed that these were most likely related to childhood ADD or ADHD. *See* PX 3 at 1 (summary of June 18, 2014 well-child exam noting that "parents both have a history of ADHD and they have started seeing signs and symptoms in [T.G.]" and showing an impression of "? ADD of Childhood with Hyperactivity"). Indeed, T.G. received a formal diagnosis of ADHD roughly over a year later. PX 17 at 22. It was not until June 13, 2015, approximately <u>two months</u> after the April vaccinations, that T.G. was brought to the hospital again, this time for fever, and was diagnosed with benign febrile illness and pediatric viral syndrome. PX 6 at 9. Following that incident, T.G. did not present to a hospital for physical symptoms again until April 21, 2016, almost one year later. It was at this time that T.G. was diagnosed as having suffered an autoimmune encephalopathy, but none of the records suggest that the treating physicians at that time considered vaccinations to have played any part in the injury. This is not surprising – the purported encephalopathy occurred roughly 14 months after T.G.'s last vaccination.

Petitioner's counsel are extremely experienced Vaccine Program litigators. An examination of the records, which the billing statement indicates was performed by Mr. Shoemaker with adequate time before the filing of the Petition, would surely have revealed the almost one-year gap between T.G.'s April 16, 2015 vaccination and his April 2016 encephalopathy diagnosis. Counsel would have reasonably understood that the temporal relationship between T.G.'s vaccinations and this injury would be a major hurdle to overcome.[10] Overall, there is nothing in the medical records which indicates that T.G.'s vaccinations caused him any harm, or that any of the injuries and/or disorders that T.G. suffers from were attributable to his vaccinations.

---

[10] I have also uncovered no instances in which a special master has found that a vaccine caused, or significantly aggravated, a petitioner's diagnosis of OCD, ADHD, or PANDAS. Additionally, T.G.'s diagnosis of periodic fever syndrome was not made until after the Petition was filed. Yet, even when armed with this new diagnosis, Petitioner was unable to obtain an expert to support any theory that T.G.'s periodic fever syndrome was caused by any of his vaccinations.

Also unavailing is Petitioner's contention that "preliminary consultations with experts" provided a reasonable basis for proceeding with the claim. As the billing record indicates, counsel did indeed reach out to several doctors concerning their opinion on the facts of this case. However, it is unclear what information or medical records were provided to these doctors in order for them to form a preliminary opinion, and Petitioner has not offered any statements or evidence from these individuals suggesting that the nascent theory she sought to substantiate had any medical validity. This, plus the fact that Petitioner's fee request does not itself provide scientific or medical substantiation for her theory, strongly underscores my conclusion that the theory itself was not tenable in any objective sense. Given the amount of time counsel had to evaluate the claim before its filing, that determination could have been made before the case began.

In sum, the totality of the circumstances reflects that the record is devoid of objective support for the claim's reasonable basis.

## CONCLUSION

For all of the reasons stated above, I conclude that Petitioner has failed to establish that there was a reasonable basis for the claim for which the petition was brought. Accordingly, I find that an award of attorney's fees and costs to Petitioner is unreasonable, and her motion is **DENIED**.[11] In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the Court is directed to enter judgment herewith.[12]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Special Master

---

[11] Also pending is Petitioner's Motion to Amend/Clarify the Payable To Party for the Motion for Attorney's Fees and Costs (ECF No. 26). Because Petitioner is not entitled to any award of attorney's fees and costs due to lack of reasonable basis, this motion shall be **DENIED** as moot.

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the Parties' joint filing of notice renouncing the right to seek review.